**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COAL RIVER MOUNTAIN WATCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-1606 (KBJ) |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Coal River Mountain Watch ("Coal River") is a non-profit organization that advocates for Appalachian communities affected by coal mining practices. Just over four years ago, Coal River determined that a particular West Virginia mining permit had not been utilized for more than three years after it had issued, and citing provisions of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. § 1201 *et seq.*, Coal River asked the West Virginia Department of Environmental Protection ("WVDEP") to declare that the permit had terminated automatically due to its nonuse. WVDEP declined to make the requested declaration, pointing to its own internal policy that requires the issuance of a warning notice to the permit holder prior to the termination of a permit. Coal River then took its automatic-termination contention to the regional office of the Office of Surface Mining ("OSM") within the United States Department of the Interior, which agreed with Coal River that WVDEP's notice policy was arbitrary and capricious and contravened the pertinent

provisions of the SMCRA.  WVDEP requested a review of the regional office's determination from OSM's headquarters (which is stationed in the District of Columbia), and in a detailed letter ("Decision Letter"), OSM headquarters reached the opposite conclusion—*i.e.*, it determined that the SMCRA could, and should, be read as permitting WVDEP's pre-termination notice policy.  Coal River brings the instant action against OSM, the Department of the Interior, and various officials in their official capacities (collectively referred to herein as "the government") claiming that OSM headquarters' determination was a rulemaking that required notice-and-comment procedures, and that its substantive conclusion was contrary to governing law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  Notably, Coal River also filed a substantively identical APA lawsuit against these same defendants in the United States District Court for the Southern District of West Virginia ("SDWV").

Before this Court at present is the government's motion to dismiss this case in order "[t]o avoid duplicative litigation and promote judicial economy and comity" in light of the pending action in the Southern District of West Virginia.  (Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Mot."), ECF No. 19, at 13.)[1]  The government cites cases in which one of two substantively identical and parallel actions is dismissed on equitable grounds, and asks this Court to follow that path.  In response, Coal River contends that this Court has exclusive jurisdiction under 30 U.S.C. § 1276(a)(1) and thus cannot dismiss this matter in deference to another forum; moreover, and in the

---

[1] Page-number citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

alternative, Coal River argues that the equities support keeping the case in this Court. (Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), ECF No. 21, at 7–8.)

As explained fully below, this Court concludes that both parties' arguments are flawed: Coal River is mistaken to suggest that this Court *must* decide whether or not it has exclusive jurisdiction before considering the merits of the government's motion to dismiss, and when the merits of the government's motion are considered, the government is mistaken to conclude that the equities weigh strongly in favor of dismissing this case in deference to the pending action in West Virginia.  What is more, because Coal River has filed a motion for voluntary dismissal in the West Virginia case—and neither party has provided any reason why that request might be denied—in all likelihood the West Virginia action will soon cease to exist, taking with it the government's only basis for characterizing the instant case as a "parallel action" at all. At bottom, the government's purported concern for "comity and [the] orderly administration of justice" (Defs.' Mot. at 13 (citation omitted)) appears to be a calculated attempt to force Coal River to pursue its APA claims in federal court in West Virginia, despite the fact that Coal River has selected the instant forum and without due regard to the most pertinent equitable considerations, which do not support overriding Coal River's choice under the circumstances presented here.  Thus, the pending motion to dismiss will be **DENIED**.

## I.   BACKGROUND

### A.   Facts

This case centers on the SMCRA, a federal statute designed to "establish a nationwide program to protect society and the environment from the adverse effects of

surface coal mining operations." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 268 (1981) (citation omitted).  As part of its comprehensive regulatory scheme, the SMCRA provides for federal coordination with the states.  For example, a State wishing to take "permanent regulatory authority over the surface coal mining operations on non-Federal lands within its borders must submit a proposed permanent program" to the Secretary of the Interior "for his approval[,]" *id.* at 271 (internal quotation marks and footnote omitted), which the state of West Virginia has done, *see* 30 C.F.R. § 948.10.  Significantly for present purposes, the SMCRA also provides that certain mining permits "shall terminate if the permittee has not commenced the surface coal mining operations covered by such permit within three years of the issuance of the permit[,]" subject to the regulatory authority's ability to grant reasonable extensions of time upon a showing that extensions are necessary because of extenuating circumstances and other exceptions not relevant here.  30 U.S.C. § 1256(c).  The Department of the Interior has promulgated a regulation that tracks the SMCRA's language in this regard.  *See* 30 C.F.R. § 773.19(e)(1) ("A permit shall terminate if the permittee has not begun the surface coal mining and reclamation operation covered by the permit within 3 years of the issuance of the permit.").  Furthermore, West Virginia has enacted a similar law with respect to its approved state mining program: a "permit terminates if the permittee has not commenced the surface mining operations covered by the permit within three years of the date the permit was issued."  W. Va. Code § 22-3-8(a)(3).

The events leading to the instant lawsuit commenced on June 6, 2008, when Marfork Coal Company, a West Virginia company, received a mining permit of the type

that the SMCRA contemplates for its Eagle No. 2 mine.  (Am. Compl. ("Compl."), ECF No. 17, ¶¶ 32–33.)  As of June 6, 2011—three years to the day after the permit issued—Marfork had not commenced mining, and Coal River asked WVDEP to deem Marfork's permit void under 30 U.S.C. § 1256 and its implementing regulations, which Coal River interpreted as establishing that Marfork's permit necessarily expired as of that date. (*Id.* ¶¶ 34, 36.)  WVDEP alerted Marfork to the situation, and Marfork requested that the permit be extended—a request that WVDEP granted in February of 2012.  (*Id.* ¶¶ 37–38.)

Shortly thereafter, Coal River raised the automatic-termination issue with the regional Field Office of OSM, which is located in Charleston, West Virginia (referred to herein as the "Charleston Field Office" or "CHFO").  In response, the Charleston Field Office sent WVDEP a ten-day notice requesting an explanation of its position with respect to the Markfork permit.  (*Id.* ¶¶ 39–40; Defs.' Mot. at 10.)[2]  WVDEP then informed CHFO of its internal policy that requires WVDEP to give a permit holder notice before terminating a permit, and it explained that, because WVDEP had given no such notice to Marfork, the permit at issue had not terminated prior to its extension. (Compl. ¶ 41.)  CHFO evaluated WVDEP's response and concluded that it was unsatisfactory because, in CHFO's view, the plain meaning of the SMCRA requires that a mining permit terminate if three years pass without the commencement of mining, and

---

[2] A "ten-day notice" is a term of art in the SMCRA context.  If OSM or an equivalent "authorized representative of the Secretary [of the Interior]" has reason to believe there may be a violation of a state's approved regulatory program, it sends a document to the state regulatory authority giving the authority ten days to take "appropriate action" to assure the violation is corrected or to show "good cause" for failing to do so.  30 C.F.R. §§ 842.11(b)(1)(ii)(B)(1), 843.12(a)(2).  A state can show good cause by, *inter alia*, showing the possible violation does not exist, *id.* § 842.11(b)(1)(ii)(B)(4)(*i*), but if the response is "arbitrary, capricious, or an abuse of discretion[,]" OSM is authorized to take corrective action, *id.* § 842.11(b)(1)(ii)(B)(2); *see also id.* § 843.12(a)(2).

nothing in West Virginia's federally approved mining program requires pre-termination notice.  (*See id.* ¶ 43.)  Thus, according to CHFO, WVDEP's notice requirement contradicted the SMCRA in a manner that was arbitrary and capricious, and as a result, the federal government was authorized to take corrective action with respect to that apparent violation, *see* 30 C.F.R. § 843.12(a)(2).  (*See* Compl. ¶43.)

Thereafter, WVDEP requested that OSM's headquarters in the District of Columbia review the Charleston Field Office's decision (*see id.* ¶ 44) pursuant to 30 C.F.R. § 842.11(b)(1)(iii)(A), which led to the issuance of the Decision Letter at the heart of this case.  In several pages of detailed reasoning, an OSM Deputy Director explained why OSM disagreed with CHFO's interpretation of the statute, and, consequently, why OSM disagreed with that office's conclusion on the automatic-termination question.  (*See* Letter from Glenda H. Owens, OSM Deputy Director, to Thomas Clarke, WVDEP Director, Ex. A to Defs.' Mot., ECF No. 19-1 ("Decision Letter"), at 10–14.)  After recounting the procedural history of the matter and the relevant regulatory and statutory provisions, the letter proceeded to "set forth OSM's legal interpretation of the applicable provisions of law."  (*Id.* at 2.)  OSM noted that its investigation into "whether . . . WVDEP's interpretation [wa]s correct" (*id.* at 10) was based upon the well-settled principle that "if SMCRA is silent on the issue of whether termination of permits should automatically result when permits are not commenced within three years, then OSM may permissibly interpret the statute (and [its] regulations implementing the statute) as either effecting an automatic termination or not doing so, so long as the interpretation it adopts is reasonable" (*id.* at 11 (referencing *Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837 (1984))).  OSM paired

that observation with case law involving "automatic forfeitures," which the agency interpreted to hold that, "if forfeiture is not mandated by 'clear and unequivocal' language in SMCRA [and its regulations], then we should not construe our statute and regulations as imposing this harsh penalty." (*Id.*)  Tying the two together, OSM pointed to cases that stand for the more general proposition that Congress's "use of the word 'shall'"—such as in the three-year permit termination provision at issue—"does not necessarily give rise to a mandatory, nondiscretionary duty" (*id.* at 12 (citations omitted)); the agency found such cases to be particularly pertinent here because interpreting "shall" as mandatory would treat the statute as effecting an automatic forfeiture of the mining permit without the clear language to that effect that is ordinarily found in automatic-forfeiture federal statutes (*id.*; *see also id.* (noting that "[t]ypically, Congress . . . uses language that leaves no doubt about its intent to effect an automatic forfeiture" (citations omitted)); *id.* at 11 (finding it "highly significant . . . that neither SMCRA, the Federal regulations, nor the West Virginia Code expressly state whether the termination occurs automatically by operation of law at the end of [the three-year] time frame or whether administrative action is required to terminate the permit")).  Thus, OSM concluded, not only was WVDEP's pre-termination notice policy "*permissible* and *reasonable*," it was also "the *preferable* interpretation" of the SMCRA's termination provision (*id.* at 12 (emphasis in original)), and as a result, WVDEP had not acted arbitrarily or capriciously or in violation of the law when it determined that the Marfork permit had not automatically terminated (*id.* at 13).

### B.   Procedural History

After it reviewed the Decision Letter from OSM headquarters, Coal River filed suit in this Court against the Department of the Interior, OSM, and the Secretary of the

Interior and Director of OSM in their official capacities, alleging that (1) the Decision Letter itself was a rulemaking that triggered the APA's notice-and-comment procedures; and (2) the Decision Letter's substantive conclusion—*i.e.*, that WVDEP's pre-termination notice policy and declination to deem the Marfork permit terminated was permissible because the SMCRA is better interpreted as not requiring the automatic termination of permits—contravened the SMCRA and thus violated the APA.  (*See* Coal River's First Compl., ECF No. 1, ¶¶ 53–59.)  Coal River filed the instant action in the U.S. District Court for the District of Columbia on October 21, 2013, and on that same day, Coal River also filed a lawsuit in the U.S. District Court for the Southern District of West Virginia—as relevant here, the West Virginia federal action raised claims against Defendants that are identical to those that were brought in the instant case.  (*See* Coal River's West Virginia Complaint, Ex. B to Defs.' Mot. ("West Virginia Complaint"), ECF No. 19-2, ¶¶ 55–58, 63–65.)

The procedural maneuvering intensified the following spring.  First, on April 15, 2014, Defendants filed in this Court a motion to dismiss the complaint or, in the alternative, stay the case, on equitable grounds; this motion asked this Court to "dismiss the instant case without prejudice in favor of the pending West Virginia case" in order to "avoid duplicative litigation and conserve judicial resources[.]"  (Defs.' First Mot. to Dismiss, ECF No. 11, at 7.)  Then, on April 17, 2014, the litigants in the West Virginia case (Defendants and Coal River) jointly requested a stay of the West Virginia action pending resolution of the motion to dismiss that Defendants had filed in the instant matter.  (*See* Defs.' First Reply, ECF No. 13, at 6; SDWV Order Granting Joint Motion to Stay Case, Ex. A to Defs.' First Reply ("West Virginia Stay Order"), ECF 13-1, at 1)

The judge in the West Virginia case stayed that action as requested on April 21, 2014 (*see* West Virginia Stay Order at 1, 5), and three days later, on April 24, 2014, Coal River filed a motion in that court requesting voluntary dismissal of that case without prejudice.  (*See* Pl.'s First Opp'n, ECF No. 12, at 7; Pl.'s Mem. in Support of Mot. to Dismiss West Virginia Case Without Prejudice, Ex. B to Defs.' First Reply, ECF No. 13-2, at 2.)  Shortly thereafter, in the instant case, Coal River filed an opposition to Defendants' motion to dismiss the case (*see* Pl.'s First Opp'n, ECF No. 12), and Defendants responded by filing a reply that, among other things, suggested that Coal River's West Virginia voluntary dismissal motion had been improperly "filed in violation of [the] stay" in the West Virginia proceeding (*see* Defs.' First Reply at 6).

On December 1, 2014, before this Court took any action on Defendants' motion to dismiss, Coal River requested leave to amend its original complaint, which this Court granted.  (*See* Minute Order of December 2, 2014.)  Accordingly, the Court denied the Defendants' motion to dismiss, without prejudice and with leave to refile after Coal River had filed the amended complaint.  (*See id.*)  Thereafter, Coal River filed an amended complaint that reiterated its APA claims (*see* Compl. ¶¶ 55–61), and Defendants renewed their motion to dismiss "[t]o avoid duplicative litigation" in light of the stayed West Virginia matter (Defs.' Mot. at 8).  It is this (second) motion to dismiss that was the subject of a hearing that this Court held on October 20, 2015 (*see* Minute Entry of October 20, 2015) and that is also the subject of the instant Memorandum Opinion.

## II.    LEGAL STANDARDS

The government requests dismissal of Coal River's complaint pursuant to the established doctrine that counsels against the maintenance of parallel actions in federal court.  *See, e.g.*, *Wash. Metro Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980); *Furniture Brands Int'l, Inc. v. U.S. Int'l Trade Comm'n*, 804 F. Supp. 2d 1, 3–4 (D.D.C. 2011); *see also* 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1360 (3d ed. 2004) (explaining that courts derive authority to hear "motions to dismiss because another action is pending" from their "inherent power . . . to regulate actions pending before [them]"); Sandra L. Potter, *The First-Filed "Rule" and Moving to Dismiss Duplicative Federal Litigation*, 33 Rev. Litig. 603, 607, 615 (2014) (observing that these motions, while well established, are not explicitly addressed in Rule 12 of the Federal Rules of Civil Procedure).  It is well settled that "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously."  *Ragonese*, 617 F.2d at 830 (citation omitted).  Accordingly, district courts "have the discretion to stay or dismiss a pending suit when confronted with parallel litigation of factually related cases filed in two separate forums."  *Furniture Brands*, 804 F. Supp. 2d at 3–4 (citing *Handy v. Shaw*, 325 F.3d 346, 349 (D.C. Cir. 2003)).

When deciding whether or not to dismiss a case on the grounds that it is a parallel action, courts ordinarily consider various "equitable considerations[.]"  *Furniture Brands*, 804 F. Supp. 2d at 6–7.  One important consideration is which action is older; indeed, the parallel-action inquiry is often called the "first-filed rule[.]"  *Id.* at 4.  But courts have made clear that the question is a holistic one—*i.e.*, the court should consider whether "the second-filed action [actually] deserves priority," *id.* (citation

omitted), and the analysis encompasses the entire basket of equitable principles that can weigh in favor of one forum over another as the proper place to decide the merits. *See id.* at 4–5 (stating that the "first to file rule . . . determines which court may decide the merits of substantially similar cases" (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999) (internal quotation marks omitted; omission in original)); *see also Villa v. Salazar*, 933 F. Supp. 2d 50, 54 (D.D.C. 2013) (explaining that the first-filed concept is "a guide, not a rule," and that "weighing equitable considerations" is required (citation omitted)); Potter, *supra*, at 614 ("Although it is referred to as the 'first-filed rule,' it is instead an equitable doctrine."). Such equitable considerations include "(1) whether all parties are present in both cases, (2) the location of the witnesses, and (3) the stage of the respective proceedings." *Furniture Brands*, 804 F. Supp. 2d at 6–7 (citing *Columbia Plaza Corp. v. Sec. Nat'l Bank*, 525 F.2d 620, 629 (D.C. Cir. 1975)). Courts have also considered whether one forum has a particular expertise with the subject matter that better positions it to decide the case. *See id.* at 7.

## III.   DISCUSSION

As explained, the government has requested that this Court dismiss Coal River's complaint in the interest of judicial economy in light of the nearly identical (albeit currently stayed) case that Coal River has filed in the Southern District of West Virginia. As a threshold matter, the parties have engaged in a vigorous debate regarding this Court's subject-matter jurisdiction—a debate that, more specifically, centers on whether or not this Court must interpret and apply one of the SMCRA's judicial-review provisions prior to ruling on the instant motion to dismiss. Section 1276(a)(1) of Title 30 of the U.S. Code states that "[a]ny action by the Secretary

promulgating national rules or regulations . . . shall be subject to judicial review in the United States District Court for the District of Columbia[,]" but "[a]ny other action constituting rulemaking by the Secretary shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located." 30 U.S.C. § 1276(a)(1). The D.C. Circuit has characterized this SMCRA provision as a non-waivable "forum prescription[,]" *Save Our Cumberland Mountains, Inc. v. Lujan*, 963 F.2d 1541, 1550–1551 (D.C. Cir. 1992) (citing cases), and thus, when applicable, section 1276(a)(1) has the effect of making the listed court the "exclusive" forum, *see id.* at 1551; *see also New Mexico ex rel. Energy & Minerals Dep't, Mining and Minerals Div. v. U.S. Dep't of the Interior*, 820 F.2d 441, 443, 446 (D.C. Cir. 1987). Nevertheless, here, the government maintains that this Court need not consider whether OSM's Decision Letter qualifies as a national rulemaking for the purpose of section 1276(a)(1) before ruling on its motion to dismiss because this case can be dismissed "for the sake of judicial economy and efficiency" without addressing any jurisdictional issues at all. (Defs.' Mot. at 20; *see also id.* at 19 (citing *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422 (2007)).) Coal River responds by insisting that this Court should answer the exclusivity questions that section 1276(a)(1) poses—and thereby find that this Court has exclusive jurisdiction over this matter under the statute—before proceeding to address the merits of the government's motion to dismiss, which, Coal River argues, is entirely meritless. (Pl.'s Opp'n at 9 (asserting that "[t]he Court should undertake an initial assessment of jurisdiction[,]" and should, in making that assessment, "find that the instant challenge to OSM's interpretation of its national rules and regulations, regarding how permits terminate under SMCRA,

belongs exclusively in the District of Columbia district court").)

As explained below, this Court is convinced that it need not consider section 1276(a)(1), or its potential implications for the exercise of this Court's jurisdiction, prior to resolving the government's motion to dismiss for two reasons: first, because this Court has federal-question subject-matter jurisdiction over Coal River's complaint and there is no basis for contending that the forum-selection clause in section 1276(a)(1) deprives this Court of that jurisdiction; and second, because the nature of the government's motion is such that this Court could address it even if the Court's subject-matter jurisdiction were in question.  That said, with respect to the merits of the government's motion, this Court concludes that the equities firmly support retaining the case in this district.

### A. This Court Need Not Consider Section 1276(a)'s Judicial-Review Provision Prior To Ruling On The Government's Motion To Dismiss

#### 1.   This Court Has Subject-Matter Jurisdiction Under 28 U.S.C. § 1331

Coal River's complaint presents a garden-variety APA claim insofar as it alleges that OSM promulgated a rule without necessary notice and comment, in violation of 5 U.S.C. §§ 553, 706(2)(A), (D) (*see* Compl. ¶¶ 57–58), and that OSM's Decision Letter was arbitrary and capricious and contravened governing federal law and regulations, in violation of 5 U.S.C. § 706(2)(A) (*see id.* ¶¶ 60–61).  The APA creates a "limited cause of action for parties adversely affected by agency action[,]" *Trudeau v. FTC*, 456 F.3d 178, 185 & n.9 (D.C. Cir. 2006) (citation omitted); therefore, in cases such as this one, it is generally accepted that federal courts have federal-question subject-matter jurisdiction under 28 U.S.C. § 1331.  *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 748 (2012) ("[T]here is no serious debate that a federally created claim for relief is

generally a sufficient condition for federal-question jurisdiction." (internal quotation marks and citation omitted)); *Oryszak v. Sullivan*, 576 F.3d 522, 524–25 (D.C. Cir. 2009); *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.*, 55 F. Supp. 3d 124, 133–34 (D.D.C. 2014) (explaining that a court has subject-matter jurisdiction over a claim that an agency "misinterpreted and misapplied" a statutory provision "in violation of the APA" (citation omitted)).  Moreover, in its complaint, Coal River expressly invokes federal-question jurisdiction as one of the bases for this Court's exercise of jurisdiction over this case.  (*See* Compl. ¶ 7).

    With jurisdiction apparent, then, this Court has the power to preside over the instant action—including ruling on any motions presented herein—unless some principle or provision of law clearly and unequivocally ousts this Court of its established authority to hear the case.  *See, e.g.*, *Mims*, 132 S. Ct. at 748–49 (explaining that the principle that district courts have federal-question jurisdiction over claims arising under federal law "endures unless Congress divests federal courts of [that] § 1331 adjudicatory authority" (citations omitted)); *see also id.* (explaining that federal courts should hesitate before finding "[d]ivestment of district court jurisdiction . . . given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331" (internal quotation marks and citations omitted)).  Notably, neither party in the instant matter suggests that any such principle or provision is at work here, and this Court detects none.  However, rather than leaving the matter of jurisdiction there and turning to focus on the merits of the government's motion to dismiss, the parties get mired in a brawl over the *potential* applicability of section 1276(a)(1)'s judicial-review

provision and whether or not this Court should address *that* statutory provision before it rules on the government's motion to dismiss.

Briefly and in sum, the battle is joined over the portion of section 1276(a)(1) that directs national rulemakings exclusively to the district court for the District of Columbia. *See* 30 U.S.C. § 1276(a)(1) ("Any action by the Secretary promulgating national rules or regulations . . . shall be subject to judicial review in the United States District Court for the District of Columbia[.]"); *see also New Mexico ex rel. Energy & Minerals Dep't*, 820 F.2d at 443 (interpreting this statutory section to mean that, if the regulations at issue are "national in scope, exclusive jurisdiction to review them rest[s] in the United States District Court for the District of Columbia"). The government lands the first blow, asserting that this Court should not be snowed by any subsequent argument of Coal River that this Court must decide *at the outset* whether or not the challenged agency action is a "national" rulemaking such that the Court has exclusive jurisdiction within the meaning of section 1276(a)(1) before it rules on the motion to dismiss. (*See* Defs.' Mot. at 19.) For support, the government cites a series of cases that stem from *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007), and that stand for the proposition that, when a dismissal would "den[y] audience to a case on the merits" and thus would not "entail any assumption . . . of substantive law-declaring power[,]" a "federal court may . . . dismiss a case on prudential grounds prior to establishing its jurisdiction[.]" *Pub. Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1347–48 (D.C. Cir. 2007) (internal quotation marks and citations omitted; first omission in original) (citing *Sinochem*, 549 U.S. at 432–33). Coal River fires back, disputing the applicability of the *Sinochem*

doctrine here, and urging this Court not only to "undertake an initial assessment of jurisdiction" but also to find that "the instant challenge to OSM's interpretation of its national rules and regulations, regarding how permits terminate under SMCRA, belongs exclusively in the District of Columbia district court." (Pl.'s Opp. at 9.)

In the midst of this melee, both parties overlook the simple fact that this Court derives its authority to proceed with respect to the instant action from section 1331 of Title 28—*not* SMCRA's judicial-review provision—and thus, determining the "exclusivity" of this Court's jurisdiction under the terms of section 1276(a) of the SMCRA appears to be beside the point for present purposes.  After all, the D.C. Circuit has repeatedly characterized section 1276(a) as a "forum rule" that is designed to establish "special limitations for the adjudication of special subjects[,]" *Save Our Cumberland Mountains*, 963 F.2d at 1551 (citation omitted)—in clear contrast to a standard jurisdictional provision.  And while the practical impact of section 1276(a)(1) may be "equated" with a limitation on subject-matter jurisdiction due to its non-waivability, *id.*, there is nothing in prior precedent that indicates that a mandatory venue provision such as the one at issue here must be treated as a jurisdictional rule of the Article III variety, and this especially so given that Congress ordinarily needs to speak of divestment of jurisdictional authority in clear and explicit terms in order to accomplish that result.  *See Mims*, 132 S. Ct. at 749.

In other words, without a clear indication that Congress meant section 1276(a)(1) to strip this Court of its Article III power to hear this federal case or controversy where applicable, that statutory provision is better construed as a procedural rule that directs which court—among the many vested with federal-question authority—should hear the

case. *See United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015) ("We have repeatedly held that procedural rules . . . cabin a court's power only if Congress has clearly state[d] as much." (internal quotation marks and citations omitted; alteration in original)); *cf. New Mexico ex rel. Energy & Minerals Dep't*, 820 F.2d at 446 (concluding, with respect to an analogous provision of the SMCRA, that the district court had "correctly recognized" that "venue over the Surface Mining Act claims was controlled by 30 U.S.C. [§] 1270(c) [the identically structured citizen-suit provision of the SMCRA] but that subject matter jurisdiction, based upon 28 U.S.C. sections 1331 and 1362, and independent of the citizens suits provision of the Surface Mining Act, gave it authority to consider and decide [a] counterclaim").  And when section 1276(a)(1) is construed as a mere forum rule (albeit mandatory), this Court is convinced that it may be set aside for now, because neither party maintains that this forum is an improper venue on this basis, and in any event, it is undisputed that this Court has federal-question subject-matter jurisdiction over this case.

> 2.  Even If The SMCRA's Judicial-Review Provision Is Jurisdictional, This Court Need Not Address It Prior To Ruling On The Pending Motion To Dismiss

With all that said, it is worth noting that the government is correct about the holding of *Sinochem*; this means that, even if this Court's jurisdiction were in doubt, the Court could nevertheless proceed to address the pending motion to dismiss.  It is well established that a federal court need not determine whether it has subject-matter jurisdiction before it resolves certain types of "non-merits, nonjurisdictional issues[.]" *Pac. Maritime Ass'n v. NLRB*, 905 F. Supp. 2d 55, 58 (D.D.C. 2012) (quoting *Pub. Citizen*, 486 F.3d at 1348).  Judges in this district routinely apply this principle, *see, e.g.*, *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 79 (D.D.C. 2009) (collecting cases), and in

fact, one judge has done so in circumstances that are similar to the case at bar.  In *Furniture Brands International, Inc. v. United States International Trade Commission*, 804 F. Supp. 2d 1 (D.D.C. 2011), the plaintiff had filed suit in both this district and the Court of International Trade, *see id.* at 2, and relying on *Sinochem* and *Public Citizen*, the court rejected plaintiff's claim that the court had "an independent obligation to assess its jurisdiction over th[e] case[]" before it addressed "prudential considerations" like a dismissal on parallel-action grounds.  *Id.* at 4 (citation omitted).  To the contrary, the *Furniture Brands* court decided that the appropriateness of this type of dismissal is precisely the type of "non-merits, nonjurisdictional issue" those cases contemplate.  *Id.* (citations omitted).

So it is here.  In arguing that equitable principles counsel in favor of allowing this case to proceed in West Virginia, the government's motion raises no question of the merits as such.  *Cf. Sinochem*, 549 U.S. at 432 (explaining that a non-merits dismissal like one under *forum non conveniens* is simply "a determination that the merits should be adjudicated elsewhere").  Thus, resolving this motion would not "entail any assumption . . . of substantive law-declaring power."  *Id.* at 433 (internal quotation marks and citation omitted).  Nor would it matter that some of the equitable factors bearing on the instant motion may implicate facts that could be relevant to a later question of the appropriate forum under section 1276(a)(1) or to a question on the merits because, as *Sinochem* explained, it is often true that the determination of whether this type of pre-merits, pre-jurisdictional dismissal of a case is warranted "may . . . involve a brush with factual and legal issues of the underlying dispute."  *Id.* (internal quotation marks and citation omitted); *see also In re Facebook, Inc., Initial Pub.*

*Offering Derivative Litigation*, 797 F.3d 148, 156 n.6 (2d Cir. 2015); *In re LimitNone, LLC*, 551 F.3d 572, 573, 577–78 (7th Cir. 2008); *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 227, 232–33 (4th Cir. 2008).[3]

In short, the *Sinochem* doctrine permits a court to bypass a more difficult jurisdictional question to address an often simpler non-merits, non-jurisdictional issue that disposes of the case.  *See, e.g.*, *Furniture Brands*, 804 F. Supp. 2d at 6 (observing the presence of a difficult "open question regarding subject matter jurisdiction").  Because it is undisputed here that this Court has subject-matter jurisdiction over the APA claims in Plaintiff's complaint under 28 U.S.C. § 1331, this is not the typical *Sinochem* case; nevertheless, if a tough jurisdictional issue lurked at the threshold of this litigation—say, if the Court's subject-matter jurisdiction actually turned on which of section 1276(a)(1)'s "special limitations for the adjudication of special subjects" applies in this case, *Save Our Cumberland Mountains*, 963 F.2d at 1551 (citation omitted)—*Sinochem* teaches that this Court need not make any such determination prior to deciding the pending motion because Defendants have sought dismissal of the action on the basis of a non-merits, non-jurisdictional prudential consideration (the pendency of a substantially similar case).

---

[3] It seems clear beyond cavil that the potential that facts pertinent to the dismissal decision may be relevant to a subsequent jurisdictional or merits inquiry does not transform this decision into a jurisdictional or merits *decision*.  To take just one example, the pre-jurisdictional inquiry in *Long Term Care* necessitated a "cursory review of the merits" to determine whether there had been a "strong and clear demonstration that a clear, specific and mandatory [statutory provision] ha[d] been violated."  516 F.3d at 234 (first alteration in original; citation omitted).  Nevertheless, the court undertook that pre-jurisdictional inquiry, concluding that it was the sort of issue *Sinochem* contemplates.

**B.      The Equities Weigh Against Dismissing This Case In Deference To The Proceedings In West Virginia**

Having found that it need not address section 1276(a)(1) or confront any jurisdictional issues that that statute might pose before considering the merits of the government's motion, this Court now turns to the meat of the matter: whether the government is correct that the instant action should be dismissed on prudential grounds. According to the government, "equitable factors"—in particular, the factors that a court ordinarily considers when it is deciding whether or not to *transfer* a case to another forum—weigh strongly in favor of this Court's dismissing the instant case in deference to the pending action in the Southern District of West Virginia.  (Defs.' Mot. at 14.)  It is not at all clear that the standard venue-transfer factors are the appropriate lens through which to view a "parallel case" dismissal request.  *Compare Furniture Brands*, 804 F. Supp. 2d at 7 (asking, in a parallel-action case, whether all parties were present in both cases, where the witnesses were located, and the stage of the respective proceedings to evaluate whether or not the case should be dismissed) *with United States v. H & R Block, Inc.*, 789 F. Supp. 2d 74, 78 (D.D.C. 2011) (listing, in a venue-transfer case, nine non-exclusive "public and private interest factors").  But even so, the government's dismissal request is plainly premised on the existence of a "parallel" action, which presumably makes such an action an indispensable requirement of any consideration of the equities under the circumstances presented here.

This required element will likely soon cease to exist in the instant case.  As explained above, Coal River has not only expressed its intention to stop prosecuting the nearly identical action that it filed in the West Virginia federal court at approximately the same time as it filed the instant complaint, it has *acted* on that intention, by filing a

motion to dismiss that lawsuit voluntarily pursuant to Federal Rule of Civil Procedure 41(a)(2).  This dismissal motion is presumably only still pending because the entire West Virginia matter was stayed prior to its filing, and try as it might, this Court cannot conceive of any reason why the assigned judge in the Southern District of West Virginia would require Coal River to proceed with that action against its will, especially at this very early stage of both proceedings.  *Cf. Ellett Bros., Inc. v. U.S. Fidelity & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) ("A plaintiff's motion to voluntarily dismiss a claim should not be denied absent plain legal prejudice to the defendant[.]" (citation omitted)).  Indeed, when questioned at the motion hearing about potential reasons for denying the motion for voluntary dismissal, the government offered none.  Thus, the underlying assumption of the government's motion to dismiss the instant case—*i.e.*, that there are two parallel cases going on such that judicial efficiency requires dismissal of this one—is flawed.  Consequently, the stage-of-proceedings factor clearly favors keeping the case in this Court, and even assuming that the two cases were likely to continue in tandem, the instant action was the first of the two cases to be filed.  *See Furniture Brands*, 804 F. Supp. 2d at 4.[4]  What is more, neither of the other two equitable factors listed in *Furniture Brands* (whether all parties are present in both proceedings and the location of any witnesses) supports the dismissal request here.

Even when this Court evaluates the particular factors that the government has brought to its attention (*see* Defs.' Mot. at 14 (asserting that "[c]ourts consider a range

---

[4] To be sure, the temporal factor likely deserves little weight either way, given that Coal River's filing in this Court only preceded its West Virginia filing by one hour and forty-five minutes.  *Cf. Bader v. Air Line Pilots Ass'n, Int'l*, 63 F. Supp. 3d 29, 36–37 & n.3 (D.D.C. 2014) (transferring a case filed in the District of Columbia three days before its Illinois counterpart to the Northern District of Illinois).

of equitable factors including how closely together in time the two cases were filed, how far the cases have progressed, whether each court could fully adjudicate all issues in the case, the convenience and efficiency of proceeding in each forum, and Plaintiff's choice of forum" (citations omitted)); *see also id.* (arguing that cases involving transfer of venue "provide additional insight into relevant considerations")), it concludes that those considerations do not weigh in favor of dismissing Coal River's complaint.  The Court has considered all of these transfer factors; however, in lieu of marching methodically through each of them in this opinion, the Court finds that it makes the most sense to address head on the government's overarching and primary contention that equity requires dismissal because Coal River's "claims have limited connections to the District of Columbia but substantial connections to West Virginia."  (Defs.' Mot. at 16.)  If true, this observation would implicate several of the venue-transfer factors that focus on the degree to which an action is related to one forum over the other, *see H & R Block*, 789 F. Supp. 2d at 78–79, but for the reasons explained below, it is clear to this Court that the government's contentions regarding the relationship of the instant action to West Virginia are mistaken.

As far as the West Virginia relationship is concerned, there is no question that Coal River is based in the state of West Virginia, as is the mining project it asked WVDEP to void.  (*See* Defs.' Mot. at 17.)  But it goes too far to say that the "decisions at issue" in this case were made in West Virginia (*see id.*).  To the contrary, the agency conduct that Coal River challenges is the letter from an OSM Deputy Director in the District of Columbia that *overrode* a decision made in West Virginia by OSM's Charleston field office.  And Coal River's claims are entirely limited to that letter—it

argues the Decision Letter should have been subject to notice and comment and that its substance is wrong as a matter of law; those issues are not specific to West Virginia.[5]

The government's related assertion that the Decision Letter is "limited to a review of West Virginia's interpretation of its own state regulatory program" (*id.* at 16) is belied by the breadth of the letter's language. The Decision Letter purported to be an "informal review of the CHFO's determination" (Decision Letter at 2), and while the full text of the initial CHFO decision is not currently in the record, it appears from the Decision Letter that the CHFO based its decision on an examination of the entire statutory scheme. (*See id.* at 10 (explaining that the CHFO had interpreted the termination provisions in the SMCRA, the SMCRA's regulations, and West Virginia's statute, "as automatically terminating a permit by operation of law" after three years of non-use).) Moreover, as a general matter, the Decision Letter asserted that it contained "OSM's legal interpretation of the applicable provisions of law" (*id.* at 2), and the agency applied general principles of statutory interpretation in a manner that was not limited to the context in which the case arose. Indeed, OSM has repeated the substance of the challenged letter verbatim in a subsequent case raising a materially indistinguishable issue arising from a dispute involving an Alaska mine (*see* Compl. ¶¶ 52–54; Alaska Decision Letter, Ex. B to Pl.'s Opp'n, ECF No. 21-2, at 14–18), and it is difficult to see how the correctness of the letter's interpretation of the SMCRA's termination provision is more important as a general matter to West Virginians than to Alaskans (or anyone else with an interest in the SMCRA's operation).

---

[5] It is also quite clear to this Court that, to the extent one of the equitable considerations is which of the two courts is "more familiar with th[e] statutes" at issue and is thus the "better forum" to decide the case, *Furniture Brands*, 804 F. Supp. 2d at 7, the Southern District of West Virginia is no more qualified to evaluate a claim brought under the APA than the District of the District of Columbia.

As for the notice-and-comment aspect of this challenge, whether OSM headquarters failed to follow applicable notice-and-comment requirements has nothing to do with West Virginia's regulatory program, or, indeed, with West Virginia at all. These claims are plainly not more substantially connected to West Virginia than to the District of Columbia; if anything, given the letter's origins, this case looks more like it "arose" in the District of Columbia than in West Virginia in the first place. *Cf. Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 18 (D.D.C. 1996) (transferring case to District of Colorado where the relevant decisionmaking process "occurred in Colorado, not in Washington, D.C.").[6]  Stated simply, then, this Court concludes that the government is wrong to assert that consideration of equitable factors leads inexorably to the conclusion that West Virginia is the preferable location for resolving the legal questions in this case.

The government's response to this reasoning is to assert that the SMCRA itself demonstrates Congress's overall preferences (Defs.' Mot. at 17), including its "preference for local judicial review where the action potentially involves site-specific or local conditions[,]" *Save Our Cumberland Mountains*, 963 F.2d at 1550 (citation omitted).  This is clearly correct, as far as it goes.  But it is equally clear that the SMCRA expresses Congress's preference *in a particular way*: via provisions that vest decisionmaking authority in certain forums under specifically delineated circumstances.

---

[6] Although the government cites cases stating that "[m]ere involvement . . . on the part of federal agencies, or some federal officials who are located in Washington, D.C. is not determinative[,]" *Stockbridge-Munsee Cmty. v. United States*, 593 F. Supp. 2d 44, 47 (D.D.C. 2009) (internal quotation marks and citation omitted), that language is inapposite.  This is not a case of "mere involvement"— here, the challenged decision was made *entirely* by a federal official working at the headquarters of a federal agency located in Washington D.C., and, indeed, the government concedes that "the final decision was made in Washington, D.C." (Defs.' Mot. at 17.)  Moreover, the only decision to which Coal River objects, in both form and substance, is this final decision of the agency.

*See* 30 U.S.C. § 1276(a)(1).  Thus, if anything, this SMCRA judicial-review provision cuts *against* the government's position, since it demonstrates that Congress actually preferred the U.S. District Court of the District of Columbia's perspective under certain specified SMCRA-related circumstances, and more broadly, it also shows that Congress knows how to prevent any court but its desired court from hearing SMCRA-related cases.  Moreover, given that it is the government that has urged this Court not to address section 1276(a)(1) prior to ruling on its motion to dismiss (*see* Defs.' Mot. at 8), it is at least odd, if not contradictory, for the government to point to this same provision as evidence of an amorphous congressional preference (beyond the circumstances expressly enumerated) for Coal River's case not to be heard in a court that, by the government's own admission, is entirely competent to adjudicate it.

With the centerpiece of the government's "equitable factors" argument rejected, this Court will bypass an extended analysis of the remaining transfer factors that the government believes tip the balance in favor of dismissal.  For example, the government emphasizes that less deference is due a plaintiff's forum choice when the defendant wishes to litigate in the plaintiff's resident forum (*see* Defs.' Mot. at 15–16), at least in the venue-transfer context, *see Airport Working Grp. of Orange Cty., Inc. v. U.S. Dep't of Def.*, 226 F. Supp. 2d 227, 230 (D.D.C. 2002) (citation omitted), and it also contends that the convenience of the parties favors West Virginia (*see* Defs.' Mot. at 17), since Coal River is located there, *see H & R Block*, 789 F. Supp. 2d at 78, 80–81.  Given that courts have also held that it "is hardly inconvenient for [an agency] to litigate in the District, where [it is] headquartered," *Detroit Int'l Bridge Co. v. Canada*, 787 F. Supp. 2d 47, 51 (D.D.C. 2011), the government's "convenience" contention is questionable.

*See also Dean v. Eli Lilly & Co.*, 515 F. Supp. 2d 18, 22 (D.D.C. 2007) (noting, with respect to the convenience of the parties, that the plaintiffs there "appear[ed] willing to forego the convenience of a geographically nearby forum").  And the districts' relative caseloads are also a factor in the venue-transfer analysis, *see H & R Block*, 789 F. Supp. 2d at 78, which weighs against dismissal because this Court has a lighter caseload than the Southern District of West Virginia (*see* Judicial District Statistics, Ex. D to Pl.'s Opp'n, ECF No. 21-4, at 2–3).  Thus, it is clear that, even when one takes the equitable factors that are highlighted in transfer cases into account, the conclusion that follows from the above discussion is not altered: this case should remain in this Court.

## IV.   CONCLUSION

This Court has subject-matter jurisdiction over the instant action under 28 U.S.C. § 1331, and thus, it need not address the judicial-review provision of 30 U.S.C. § 1276(a)(1) before ruling on the government's pending motion to dismiss.  Moreover, given the *Sinochem* doctrine and the fact that the government has requested dismissal on non-jurisdictional, non-merits grounds, the Court could consider and resolve the government's motion even if its jurisdiction was in question.  Nevertheless, because the equities do not establish that this Court should dismiss the action in light of the present pendency of a substantially identical case in the Southern District of West Virginia, it is hereby

ORDERED that Defendant's [19] Motion to Dismiss is **DENIED**.


DATE:  November 25, 2015               *Ketanji Brown Jackson*
                                       KETANJI BROWN JACKSON
                                       United States District Judge